KALY MCDERMOTT,

          Plaintiff,

                                  Case No. 23-cv-705-pp

    v.

ABB INC.,

          Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 29)

On April 12, 2024, the plaintiff filed a complaint alleging that her former employer discriminated and retaliated against her based on her disability, her race and her color in violation of the Americans with Disabilities Act and Title VII of the Civil Rights Act and interfered with her rights under the Family and Medical Leave Act (FMLA). Dkt. No. 1. On October 18, 2024, the defendant filed a motion for summary judgment, arguing that it had terminated the plaintiff for non-discriminatory reasons. Dkt. No. 29. The court will grant in part and deny in part the defendant's motion.

## I.     Background

The following facts are undisputed unless otherwise noted. The plaintiff began her employment at the defendant's New Berlin, Wisconsin facility on July 15, 2019 as an Inventory Project Coordinator. Dkt. No. 32 at ¶1. This was a non-exempt, "at will" position and was subject to the defendant's various

company policies. Id. at ¶¶2, 15. The plaintiff completed trainings on the defendant's policies during the first ninety days of her employment. Id. at ¶3.

The plaintiff understood that it was the defendant's policy to provide reasonable accommodations to employees with disabilities and that she needed to inform the defendant if she needed a reasonable accommodation. Id. at ¶5. The plaintiff never asked the defendant about this policy or how it worked. Id. at ¶6. The plaintiff also understood the defendant's FMLA leave policy and that there was a procedure for requesting FMLA leave and getting any FMLA leave certified by a health care provider. Id. at ¶9. The defendant uses a third-party administrator, Sedgwick, to process FMLA requests and leaves of absence. Id. at ¶10.

The plaintiff also was familiar with the defendant's attendance policy and the potential consequences for violating it. Id. at ¶¶11, 16. According to that policy, if the plaintiff was going to be absent from work, she needed to make direct contact with her manager within thirty minutes of the start of her scheduled shift. Id. at ¶11. The purpose of this policy is to ensure that management is aware of any absences that will be occurring on that shift so that at the start of the shift, management can address and fill any labor gaps. Id. at ¶¶12–13. The attendance policy of the defendant's New Berlin facility states the following consequences for failing to comply with the policy:

> A no call/no show by an employee will constitute cause for corrective action up to and including termination of employment regardless of the number of occurrences the employee has. For non-exempt employees, a "no call" will not be paid for the absent time for any reason except absences involving a death in the immediate family, hospitalization of the employee and/or an immediate family member

or similar reasons determined by the Company, at its sole discretion, to be acceptable.

Id. at ¶14. The attendance policy also required employees who were "absent for three or more consecutive days" to contact Sedgwick with their leave requests. Dkt. No. 41 at ¶23 (quoting Dkt. No. 35-1).

The parties dispute whether the policy requires an employee who is absent for three or more consecutive workdays to communicate with both Sedgwick and their supervisor regarding the absences. Id. at ¶24. Kevin Drown, the plaintiff's supervisor, testified that if an employee had an approved leave through Sedgwick, the employee would be required to inform the defendant about the leave and provide a return-to-work date, but did "not necessarily" need to make contact "every day they're out." Id. at ¶25 (quoting Dkt. No. 35-13 at 20:23–22:1). Drown further testified that he did not know whether an employee who had a *pending* application with Sedgwick was "required" to contact the defendant every day they were absent. Id. (quoting Dkt. No. 35-13 at 20:23–22:1).

In early 2021, the plaintiff began taking approved intermittent FMLA leave for migraines. Dkt. No. 32 at ¶18. When the plaintiff took her FMLA leave, Drown reminded her of the defendant's attendance policy. Id. at ¶19. The plaintiff testified that at times Drown would require her to finish a project before taking intermittent FMLA leave, but that Drown did not delay her by more than ten or fifteen minutes during these instances. Dkt. No. 36 at ¶9 (quoting Dkt. No. 31-1 at 124:13–25).

On or about May 10, 2021, the plaintiff met with Casilynn Hansen, the defendant's HR Business Partner, to discuss complaints the plaintiff had about Drown concerning his use of racially derogatory comments in the workplace. Dkt. No. 41 at ¶2. The plaintiff complained to Hansen that Drown treated her differently because of her race (African American) and color (Black) and that he made racially derogatory comments in the workplace, including (a) stating that "it's like a little China town" regarding a coworker of Asian descent; and (b) stating that "If I were Mexican, I would own a taco truck." Id. at ¶3.

The defendant alleges that in September 2021, the plaintiff was "investigated and counseled" regarding violations of and compliance with the defendant's attendance policy. Dkt. No. 36 at ¶4. The plaintiff disputes this, arguing that the defendant presents evidence only that the plaintiff's supervisor discussed the plaintiff's time keeping while working remotely and never "counseled" her about violating the attendance policy. Id. On October 1, 2021, Drown sent an email to the plaintiff's team reminding them about the attendance policy. Id. at ¶5.

The plaintiff was absent from work on November 2, 2021. Id. at ¶10. The plaintiff testified that she forgot to timely enter her FMLA request for November 2, 2021, so that absence was not covered by her FMLA. Id. at ¶¶10–11. On November 23, 2021, the plaintiff submitted a written complaint to Hansen stating, "And honestly with him questioning my attendance and things which seems like all of 2021 it concerns me if this is a form of fmla harassment or work retaliation of some kind." Dkt. No. 41 at ¶6 (quoting Dkt. No. 35-8).

The defendant asserts that on December 10, 2021, it drafted, and intended to place the plaintiff on, a Performance Improvement Plan ("PIP") that addressed her attendance, including her failure to enter her FMLA requests in time. Dkt. No. 36 at ¶12. The plaintiff asserts that she recalled putting the purported PIP document together with Drown as part of an ongoing "review" because the defendant was "doing a lot of process improvements." <u>Id.</u> The defendant never issued the PIP document to the plaintiff. <u>Id.</u>

On December 12, 2021, the plaintiff informed Drown that her daughter had tested positive for COVID-19. Dkt. No. 32 at ¶21. Drown told the plaintiff to get tested, and she subsequently tested positive for COVID-19 and pneumonia. <u>Id.</u> at ¶22. The plaintiff was hospitalized on December 15, 2021. Dkt. No. 36 at ¶14. The next day, the plaintiff's mother, Doreen McDermott, called Drown to inform him that the plaintiff had been hospitalized with COVID-19 and pneumonia. Dkt. No. 32 at ¶23. Later that day, Hansen called Doreen McDermott to provide her with the contact information for Sedgwick so that the plaintiff could inquire about FMLA leave. <u>Id.</u> at ¶24.

The plaintiff was released from the hospital on December 23, 2021, but she did not notify the defendant that she had been released. <u>Id.</u> at ¶25. The plaintiff then was absent from work between December 27 and 30, 2021. <u>Id.</u> at ¶26. The defendant alleges that the plaintiff failed to notify Drown of her absences on December 27 through 30, even though she was physically capable of doing so. Dkt. No. 36 at ¶15. The plaintiff responds that Drown told her to

contact Sedgwick regarding her post-hospitalization leave requests and that she was thus exempt from the call-in requirement. Id.

On December 29, 2021, the plaintiff contacted Sedgwick to report her hospitalization and need for medical leave. Dkt. No. 41 at ¶13. The next day, Sedgwick notified the defendant that it approved the plaintiff's leave from December 13, 2021 through December 26, 2021. Dkt. No. 32 at ¶27. Additionally, Sedgwick notified the defendant that the plaintiff had both requested an extension of her disability leave and submitted a new disability claim, and that she would not return to work. Id. at ¶28. Sedgwick was waiting for supporting documentation from the plaintiff and stated that it would evaluate her leave request once it received the documentation. Id. at ¶29. Sedgwick's notice stated that the supporting document was due on January 19, 2022 and that it would notify the defendant once a final decision had been made. Dkt. No. 41 at ¶¶31–32. Drown testified that he did not remember receiving this notification from Sedgwick. Id. at ¶¶34–37.

The plaintiff was absent from work between January 4 and 7, and January 10 and 13, 2022. Dkt. No. 32 at ¶¶31, 33. The parties dispute whether the plaintiff needed to contact Drown directly regarding her absences on these days or whether her pending leave of absence request through Sedgwick exempted her from this requirement. Dkt. No. 36 at ¶16.

On January 4, 2022, Drown texted the plaintiff inquiring about her status and plans to return to work. Dkt. No. 32 at ¶32. The plaintiff responded with a text message stating that she had been released from the hospital on

December 23, but that she was on an oxygen machine and did not know when she could return to work due to her appointments for her lung recovery. Dkt. No. 36 at ¶¶17–18. Drown responded, instructing the plaintiff to update her short-term disability and FMLA requests if she had not already done so. Id. at ¶19.

On January 10, 2022, Drown and Hansen discussed the possibility that the plaintiff was violating the attendance policy by not calling in each day she was absent. Id. at ¶21 (citing Dkt. No. 31-1 at 58–59). Drown stated that he was "not sure" if the plaintiff could be considered a "no call no show" if she was on short-term disability leave. Dkt. No. 31-1 at 59. That same day, Drown texted the plaintiff asking if she had any updates about her return to work. Dkt. No. 32 at ¶35. The plaintiff responded that she did not have any updates and would "be in touch with HR." Dkt. No. 36 at ¶22 (quoting Dkt. No. 35-4 at 1). The defendant asserts that the plaintiff did not contact HR after this text. Id. at ¶23. The plaintiff responds that she did not contact HR because she was terminated before her next doctor's appointment, after which she had intended to update HR. Id. The parties dispute the extent to which the plaintiff proactively contacted the defendant during this time to inform it of her medical treatment, absences and FMLA paperwork. Id. at ¶¶24–26. Drown did not advise the plaintiff to call in every day for her absences in either the January 4 or the January 10 text conversations. Dkt. No. 41 at ¶21.

During the plaintiff's hospitalization and subsequent release, Drown and Hansen communicated with each other several times about the plaintiff's

7

status. Dkt. No. 32 at ¶30. After Drown texted the plaintiff on January 10, Hansen sent Lori Tocco, New Berlin's HR Representative, a message informing her that the plaintiff "has been a no call no show for a couple weeks now." Id. at ¶36. The defendant contends that the plaintiff violated the attendance policy by not calling in each day she was absent. Dkt. No. 36 at ¶¶26–27. As a result, the defendant alleges that the plaintiff had twelve "no call no show" occurrences between December 27, 2021 and January 13, 2022. Id. at ¶28. The plaintiff disputes this, arguing that she was not subject to the attendance policy because she was seeking short-term disability and FMLA leave through Sedgwick. Id. at ¶¶26–28.

Rob Snyder, Vice President of Services and Drown's supervisor, had a conversation with Hansen about the plaintiff and approved her termination. Dkt. No. 36 at ¶29. The plaintiff argues that Snyder made his decision based on a belief that the plaintiff had "abandon[ed] her position." Id. (quoting Dkt. No. 31-6 at 14:21–24). Snyder believed that the plaintiff had not been in touch with the defendant since December 26, 2021. Dkt. No. 41 at ¶43. Snyder was not informed that the plaintiff had been hospitalized for nine days in December 2021 for COVID-19 and pneumonia or that she had applied for FMLA leave related to this hospitalization. Id. at ¶¶44, 46. After Snyder approved the termination, Hansen drafted a termination letter for Drown to sign. Id. at ¶49.

Drown testified that he did not make the decision to terminate the plaintiff's employment but that he had had conversations with HR about the termination. Id. at ¶¶51–52. Drown testified that Hansen told him that she was

8

"concerned about the—the Sedgwick time return to work passing by. And there was no call, no shows then at that point, because we hadn't heard from [the plaintiff]. So, she would, you know—then obviously the grounds—two no call, no shows is termination, so she said she was considering termination." <u>Id.</u> at ¶53 (quoting Dkt. No. 35-13 at 70:17–71:1). The plaintiff alleges that Drown sent Hansen a message stating that he "was able to build a strong enough case on [the plaintiff]" and that he had gotten "approval to terminate her employment." <u>Id.</u> at ¶67. But as the defendant points out, that message was sent *from* Hansen to Drown. <u>Id.</u>

On January 12, 2021, Hansen contacted Sedgwick, asking if the plaintiff had contacted Sedgwick to extend her leave. <u>Id.</u> at ¶68. Sedgwick responded to Hansen on the same date, stating that Sedgwick had called the plaintiff and advised her of the need to return extension documents by January 19, 2022. <u>Id.</u> at ¶69.

On January 13, 2022, Drown sent the plaintiff a termination letter stating:

> Kaly, you have been a no call, no show since your approved short-term disability ended on December 26, 2021. Given that we have not heard from you and you have a poor record of attendance and/or tardiness, which was previously discussed with you and reflected in the written warning delivered to you in September, we have made the decision to terminate your employment effective immediately.

Dkt. No. 32 at ¶37.

Five days later, Hansen informed Sedgwick that the defendant had "terminated [the plaintiff] effective 1/13/2022." <u>Id.</u> at ¶70. That same day, Sedgwick approved the plaintiff's request for FMLA leave beginning December

13, 2021 through February 4, 2022. Dkt. No. 32 at ¶38. On January 22, 2022, the plaintiff sent Hansen an email inquiring about her termination and informing Hansen that she had received her FMLA approval on January 18, 2022. Id. at ¶39. On January 24, 2022, Hansen responded with the following:

> Your LOA was approved through 12/26/2021. Following that date, you did not contact Kevin, myself or Sedgwick to inform us of your status. When Kevin did a courtesy check in with you on 1/4/22 and 1/10/22, you did not provide him with enough information to validate your need for a continued leave of absence.
>
> Per the attendance policy, "When absent, employees must call their immediate manager (or other designated representative) within 30 minutes of the start of their scheduled work time. It is the responsibility of the employee to make direct contact with his/her manager. This procedure holds for every day of absence. Failure to contact the manager in a timely manner may result in corrective action."
>
> Given the lack of communication from you, we had no choice but to hold you to the attendance policy and terminate your employment.

Id. at ¶40.

## II.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential

10

element of [its] case with respect to which [it] has the burden of proof." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

<u>Id.</u> (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. <u>See</u> <u>Heft v. Moore</u>, 351 F.3d 278, 282 (7th Cir. 2003) (citing <u>Liberty Lobby</u>, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." <u>Fitzgerald v. Santoro</u>, 707 F.3d 725, 730 (7th Cir. 2013) (quoting <u>Harper v. C.R. Eng., Inc.</u>, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." <u>Fitzgerald</u>, 707 F.3d at 730 (quoting <u>Makowski v. SmithAmundsen LLC</u>, 662 F.3d 818, 822 (7th Cir. 2011)).

### III.  Motion for Summary Judgment (Dkt. No. 29)

The defendant moved for summary judgment on all claims, arguing that it had terminated the plaintiff solely because she failed to comply with its attendance policy. Dkt. No. 29.

A.    The Parties' Arguments

    1.    *Defendant's Brief (Dkt. No. 30)*

The defendant argues that the plaintiff cannot establish a *prima facie*
case of disability or race discrimination because she cannot prove that she was
meeting the defendant's legitimate employment expectations or that similarly
situated employees received more favorable treatment. Dkt. No. 30 at 11. The
defendant analyzes the discrimination claims under Title VII and the ADA
together, because it contends that the legal standard for both claims is the
same. Id. at 13. The defendant argues that the plaintiff must proceed using the
McDonnell Douglas framework because she has not presented any direct
evidence of discrimination. Id. at 12–13 (citing McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 804 (1973)). Using that framework, the defendant asserts
that the plaintiff was not meeting its legitimate expectations of compliance with
the company's attendance policy. Id. at 14. It argues that the plaintiff received
multiple "reminders and warnings" about the attendance policy, and yet she
was a "No Call/No Show" for twelve workdays between December 27, 2021 and
January 13, 2022.[1] Id. It argues that the plaintiff admits she did not contact
her supervisor within thirty minutes of her scheduled shift to inform him of her
absences on these twelve days, which constitutes a violation of the attendance
policy. Id. The defendant also argues that the plaintiff has failed to show that
there are any similarly situated employees outside of her protected classes that

---

[1] The defendant misstated that the plaintiff was absent until "January 13,
2021," rather than January 13, 2022. See id.

were not terminated after violating the attendance policy. Id. at 14–15. According to the defendant, any employee who violates the attendance policy is terminated. Id. at 15.

The defendant argues that the plaintiff cannot establish a failure to accommodate claim under the ADA because she still was required to follow the attendance policy even if she had a disability. Id. at 16. It argues that the plaintiff was physically capable of contacting Drown via text message and knew that she was required to inform HR about her status, belying her claim that she was unable to follow the attendance policy. Id.

The defendant argues that even if the plaintiff could establish a *prima facie* case of disability or race discrimination, her claim fails because the defendant had a legitimate, nondiscriminatory reason to terminate her which was not pretext for discrimination. Id. at 17. The defendant asserts that for twelve workdays, the plaintiff did not follow the call-out procedure in the attendance policy, despite knowing she was required to do so. Id. It argues that failing to follow the attendance policy is a legitimate, nondiscriminatory reason to terminate the plaintiff. Id. According to the defendant, the plaintiff cannot prove that this reason was pretextual or a lie. Id. at 18. It argues that she has not shown that the defendant did not honestly believe that she had violated the attendance policy and should be terminated as a result. Id. at 19.

The defendant argues that the plaintiff cannot establish a *prima facie* case of retaliation because she has not established there was a causal link between any protected activity and her termination. Id. at 20. The defendant

explains that for the purposes of summary judgment, it does not dispute that the plaintiff engaged in protected activity. Id. The defendant argues that it terminated the plaintiff due to her violations of the attendance policy, not because of any protected activity. Id. The defendant contends that even if the plaintiff had established a *prima facie* case of retaliation, she cannot demonstrate that the defendant's stated reason for terminating her was pretext for retaliation. Id. at 21. The defendant argues that the plaintiff has presented no evidence of retaliatory intent or animus to suggest that its reason was pretextual. Id.

The defendant argues that the plaintiff cannot establish an FMLA interference claim because she was given the FMLA leave to which she was entitled and because she failed to meet the defendant's legitimate employment expectations. Id. at 21. According to the defendant, the plaintiff cannot establish a claim for FMLA interference unless she was "denied. . . FMLA benefits to which she was entitled." Id. (citing Taylor-Novotny v. Health All. Med. Plans, Inc., 772 F.3d 478, 498 (7th Cir. 2014)). The defendant argues that the plaintiff received all FMLA leave to which she was entitled. Id. It argues that the plaintiff did not provide sufficient notice to the defendant that she intended to take leave in December 2021 and January 2022. Id. at 21–22. The defendant argues that the plaintiff violated the attendance policy and was terminated before her FMLA leave could be approved. Id. at 22. The defendant also argues that it did not violate the FMLA because it would have terminated the plaintiff for her attendance regardless of whether the plaintiff took FMLA leave. Id.

*Plaintiff's Response (Dkt. No. 38)*

The plaintiff responds that she has "conclusively established pretext" for disability discrimination as to the defendant's purported reason for terminating her. Dkt. No. 38 at 14. She argues that the daily, thirty-minute call-in requirement in the attendance policy did not apply to her because she was absent from work for three or more consecutive workdays. Id. According to the plaintiff, the attendance policy required that she submit her FMLA or short-term disability leave requests through Sedgwick, rather than contacting the defendant directly. Id. She argues that Drown also told her to submit her leave requests to Sedgwick and that she did so. Id. at 15. She says that Drown and Hansen knew that she was going to be absent for a period of time because Sedgwick notified them that she had submitted an FMLA/disability leave request and that she had until January 19, 2022 to submit documentation. Id. She asserts that she timely responded to both of Drown's text messages about her status and that on neither occasion did Drown request that she call in her absences on a daily basis. Id.

The plaintiff also contends that Drown lied in his deposition by stating that he did not try to "build a case" against the plaintiff or try to get her terminated. Id. The plaintiff asserts that on January 13, 2022, Drown sent a message to Hansen, stating that he "was able to build a strong enough case on [plaintiff]" and that management "gave [him] approval to terminate her employment." Id. She argues that Hansen lied under oath by denying that Drown was involved in the plaintiff's termination. Id. at 16. The plaintiff argues

that Hansen and Drown improperly "orchestrat[ed]" the plaintiff's termination by withholding from Snyder—the purported final decision-maker—information about the plaintiff's hospitalization and pending FMLA request,. Id. The plaintiff argues that this was an instance of "cat's paw liability" by which the discriminating supervisor manipulated an unknowing superior into approving the termination. Id. at 16–17 (citing Schandelmeier-Bartels v. Chi. Park Dist., 634 F.3d 372, 379 (7th Cir. 2011)). The plaintiff contends that Hansen and Drown knew that she was seriously ill and had until January 19, 2022 to submit documentation to Sedgwick regarding her FMLA request, yet they mischaracterized her absences as "no call, no show[s]." Id. at 17–18. According to the plaintiff, because Sedgwick later approved her leave request through February 4, 2022, she would have been on protected FMLA leave had the defendant not terminated her on January 13, 2022.[2] Id. at 18. She contends that cumulatively, this evidence establishes that the defendant's reason for terminating her was pretext for discrimination. Id.

The plaintiff also argues that she has established a failure to accommodate claim, which she says is a form of disability discrimination under the ADA. Id. She argues that the defendant knew that she was severely ill and hospitalized, but that the defendant did not take any actions to accommodate her disability or engage in the interactive process. Id. at 19. She asserts that the defendant could have given her an accommodation of a short period of time

---

[2] The plaintiff misstates the year, stating that the defendant terminated her on "January 13, 2021," rather than January 13, 2022. See id.

away from work; had the defendant done so, the plaintiff would have received her FMLA approval from Sedgwick and she would not have been terminated. Id. at 19–20.

The plaintiff argues that the same analysis should apply to her race and color discrimination claims under Title VII. Id. at 20. She argues that she has "conclusively established that [the defendant] lied about the reason for her termination" and the circumstances leading up to that termination. Id. at 21. She maintains that this establishes that the attendance policy violation is merely pretext for discrimination. Id. According to the plaintiff, in May 2021 she had complained to the defendant about Drown's allegedly discriminatory statements, raising an inference that she was terminated in retaliation. Id. at 21–22.

The plaintiff argues that she has established both FMLA interference and FMLA retaliation claims. Id. at 22. She contends that she was eligible for and entitled to FMLA, that the defendant knew of her request for FMLA leave through Sedgwick and that the defendant denied her FMLA leave by terminating her employment five days before Sedgwick approved her leave. Id. at 23. She argues that the defendant knew she had until January 19, 2022 to submit supporting documents to Sedgwick and that by terminating her before that date, the defendant interfered with her ability to obtain FMLA leave and retaliated against her for requesting leave. Id.

3. *Defendant's Reply (Dkt. No. 40)*

The defendant replies that the plaintiff misrepresents the purported message from Drown to Hansen revealing that he "built a case" to terminate the plaintiff. Dkt. No. 40 at 3–4. The defendant states that the message actually was sent from Hansen to Drown and that it supports the defendant's position that Drown was not involved in the plaintiff's termination. Id. at 4.

The defendant disputes the plaintiff's contention that the attendance policy did not apply to her because she was absent for more than three days. Id. at 5. According to the defendant, the attendance policy requires that employees communicate both with their manager and Sedgwick regarding extended absences, and that managers can implement specific call-in requirements for their individual departments. Id. at 5–6. The defendant argues that the plaintiff was not on an "approved leave of absence" for the twelve days she did not call in to work because her FMLA leave was not approved until January 18, 2022.[3] Id. at 6. The defendant asserts that the plaintiff was required to comply with the call-in requirement until her FMLA leave was approved. Id. It argues that even if the court accepts the plaintiff's reading of the attendance policy, she still was required to call in for the first two days of her extended absence; it says that her failure to do so means that she was eligible for termination under the policy regardless of the number of occurrences. Id. at 6–7.

---

[3] The defendant again misstates the year, stating that Sedgwick approved the plaintiff's FMLA leave on "January 18, 2024," rather than on January 18, 2022. See id.

The defendant argues that the plaintiff has not pled a FMLA retaliation claim and cannot raise one in her opposition brief. Id. at 7 n.1. It argues that the plaintiff merely recites the elements of an FMLA interference claim and has not established how the evidence supports her claim. Id. at 7.

B.    Analysis

As an initial matter, the plaintiff's arguments about Drown's purported message to Hansen that he "was able to build a strong enough case on [plaintiff]" and that management "gave [him] approval to terminate her employment" are without merit. The evidence shows that *Hansen* sent that message to *Drown*, not the other way around. The message does not suggest that Drown was gathering evidence to "build a case" against the plaintiff. It suggests that *Hansen* was trying to "build a case" against the plaintiff and that Hansen sought approval to terminate the plaintiff.

1.    *Discrimination under the ADA*

Count I of the complaint is titled "Discrimination and Retaliation under the ADA," but the related allegations do not actually state a retaliation claim, nor does the plaintiff argue in her response brief that she was retaliated against under the ADA. The court will construe Count I of the complaint as raising only a discrimination and failure to accommodate claim.

Section 12112(a) of the ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and

19

privileges of employment." <u>Kurtzhals v. County of Dunn</u>, 969 F.3d 725, 728 (7th Cir. 2020) (quoting 42 U.S.C. §12112(a)). "To prove a violation of § 12112(a), a plaintiff must show that: (1) [s]he is disabled; (2) [s]he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by [her] disability." <u>Roberts v. City of Chicago</u>, 817 F.3d 561, 565 (7th Cir. 2016). "To establish the third prong and survive summary judgment, a plaintiff must show a genuine issue of material fact exists regarding whether [her] disability was the 'but for' reason for the adverse action, in this case termination." <u>Monroe v. Ind. Dep't of Transp.</u>, 871 F.3d 495, 504 (7th Cir. 2017) (citing <u>Serwatka v. Rockwell Automation, Inc.</u>, 591 F.3d 957, 962 (7th Cir. 2010)). Discrimination under the ADA also includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. §12112(b)(5)(A); <u>EEOC v. Sears, Roebuck & Co.</u>, 417 F.3d 789, 796–97 (7th Cir. 2005).

For the purposes of summary judgment, the parties do not dispute that the plaintiff was disabled by her illness. Nor do the parties dispute that her termination was an adverse action. The defendant argues only that the plaintiff was not meeting its legitimate expectations because she was not complying with the attendance policy and that there is no evidence that similarly situated employees were treated more favorably than the plaintiff.

By combining its analyses for the ADA and the Title VII claims into one, the defendant argues the wrong standard for an ADA claim. The defendant makes no argument about whether the plaintiff was "qualified" to perform the essential functions of her job with or without a reasonable accommodation. The defendant's arguments go to the *causation* prong of the analysis; it contends that it terminated the plaintiff due to her attendance violations rather than her disability. The plaintiff's brief doesn't do much better, arguing primarily that the defendant's reason for terminating her was pretextual. The court will assume for purposes of summary judgment that the plaintiff was a qualified individual with a disability and turn to the causation prong.

The evidence in the record establishes a genuine issue of material fact as to whether the plaintiff's disability was the but-for cause of her termination. On December 30, 2021, Sedgwick sent Drown and Hansen an email stating that the plaintiff had requested an extension of her disability leave and would not return to work. Dkt. No. 35-3 at 2. On January 10, 2022, after Drown texted the plaintiff about returning to work, Hansen and Drown had the following exchange:

Hansen: Has [the plaintiff] given you any indication of when she intends to return?

Drown: No

Hansen: I'm concerned with her no call/no show . . .

Drown: oh as far as not calling or being here

Hansen: yea

Drown: after her release from the hospital I mean

Hansen: has she been calling to say she won't be in?
Hansen: yes

Drown: No
Drown: I have only heard from her when I have reached out other than when her Mother called me

Hansen: when did her mom call you?

Drown: Same day she called Lois, let me find the date
Drown: give me a min my phone wont go back that far in history

Hansen: no, I'm saying that she hasn't been calling in every day per the attendance policy
Hansen: She's been no call/no show

Drown: I am not sure how you view that if she is under [short-term disability] would it be no call no show
Drown: 12/16
Drown: Was the date we got the call

Hansen: she was approved through 12/26

Dkt. No. 35-2 at 3–4. Neither party mentioned that the plaintiff had requested from Sedgwick an extension of her leave. Two days later, Hansen contacted Sedgwick and inquired if the plaintiff had requested to extend her leave of absence. Dkt. No. 35-10. On January 13 at 10:28 a.m., a Sedgwick representative, Justine L., responded to Hansen that she had left a voicemail with the plaintiff advising her that she had until January 19, 2022 to submit updated documentation for her leave of absence. Id. That same day, Hansen sent Drown a message stating that Hansen "was able to build a strong enough case" to terminate the plaintiff. Dkt. No. 35-7.

The undisputed facts show that Drown expressed to Hansen his belief that he was "not sure" if the plaintiff could be considered a "no call no show" if

22

she was on short-term disability. The plaintiff told Drown that she was severely ill and did not know when she could return to work; Drown relayed that information to Hansen. Sedgwick also informed Hansen on two occasions that the plaintiff had until January 19, 2022 to substantiate her need for further leave. Despite this, Hansen drafted a termination letter five days before the plaintiff's Sedgwick deadline, stating that the plaintiff had been "a no call, no show since [her] approved short-term disability ended on December 26, 2021" and that she was being terminated because the defendant had not heard from her. Dkt. No. 35-6. Hansen later emailed the plaintiff stating that the plaintiff "did not contact" Sedgwick about her need for leave. Dkt. No. 35-11 at 1.

A reasonable jury could find that Hansen knowingly made inaccurate statements to the plaintiff about the reasons for her termination. Hansen knew that the plaintiff had contacted Sedgwick seeking to extend her leave and knew that she had until January 19, 2022 to substantiate that leave. Hansen did not give the plaintiff a chance to do so. She sought to terminate the plaintiff five days prior to that deadline. Hansen also stated that the plaintiff "did not provide [Drown] with enough information to validate [her] need for a continued leave of absence." Dkt. No. 35-11 at 1. Under the defendant's attendance policy, Drown was not responsible for "validating" the plaintiff's need for leave—and likely had no authority to do so. The defendant had delegated that responsibility to Sedgwick. The defendant's argument that the plaintiff did not present a legitimate reason for continued leave when she told Drown that she

had just been released from the hospital on December 23 and was on an oxygen machine also strains credulity.

The undisputed facts show that Hansen knew that the plaintiff was suffering from a serious illness, that she had requested an extension of her disability or FMLA leave and that she had until January 19, 2022 to validate that leave. Yet Hansen rushed to terminate the plaintiff on January 13, 2022 due to her "absences." A reasonable jury could find that these facts suggest Hansen harbored discriminatory animus towards the plaintiff due to her disability. See Arroyo v. Volvo Grp. N. Am., LLC, 805 F.3d 278, 287 (7th Cir. 2015) (reversing summary judgment for the defendant on ADA claim where there was evidence that the defendant sought to discipline plaintiff for absences it knew were due to her hospitalization).

Although the plaintiff has not presented evidence of similarly situated employees who were treated more favorably than she, she is not required to do so. Although the McDonnell Douglas framework asks whether there were similarly situated employees who were treated more favorably than the plaintiff, "[a]n employee can prove discrimination either 'directly' through admissions or circumstantial evidence . . . or 'indirectly' through the familiar burden-shifting scheme of McDonnell Douglas Corp. v. Green." Arroyo, 805 F.3d at 287. The plaintiff does not invoke the McDonnell Douglas framework, so she need not present evidence of comparator employees. The ultimate question under either approach is "whether a reasonable jury could find prohibited discrimination." Bass v. Joliet Pub. Sch. Dist. No. 86, 746 F.3d 835, 840 (7th Cir. 2014).

For the reasons stated above, a reasonable jury could find that the plaintiff's disability and related absences were the cause of her termination. Further, there is no evidence in the record that it would have been unreasonable or an undue hardship for the defendant to accommodate the plaintiff's absences for a short time while her illness resolved, which can be an additional basis for liability under the ADA. See EEOC v. Wal-Mart Stores E. LP, 436 F. Supp. 3d 1190, 1205 (E.D. Wis. 2020) (denying summary judgment for employer where there was no evidence of undue hardship to the employer in accommodating the plaintiff's absences).

The court will deny summary judgment for the defendant on Count I of the complaint.

2.    *Discrimination and Retaliation under Title VII*

The parties present much the same arguments for and against summary judgment regarding the plaintiff's Title VII claim. At the summary judgment stage, a plaintiff making a Title VII claim may choose to utilize the McDonnell Douglas burden-shifting framework, under which the plaintiff bears the burden of establishing that she (1) belonged to a protected class; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was similarly situated to other employees who were not members of the protected class and were treated more favorably. David v. Bd. of Trs. of Cmty. Coll. Dist. No. 50, 846 F.3d 216, 225 (7th Cir. 2017). If the plaintiff satisfies that burden, she has proven a *prima facie* case and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment

action. Id. If the employer does so, the burden shifts back to the plaintiff to show that the employer's explanation is pretextual. Id.

In the alternative, a plaintiff can support her discrimination claim with "direct or circumstantial evidence that supports an inference of intentional discrimination." Joll v. Valparaiso Cmty. Schs., 953 F.3d 923, 929 (7th Cir. 2020) (quotation omitted). Under this approach, the court "ask[s] whether the totality of the evidence shows discrimination." Igasaki v. Ill. Dep't of Fin. & Pro. Regul., 988 F.3d 948, 958–59 (7th Cir. 2021) (citing Ortiz v. Warner Enter., Inc., 834 F.3d 760, 765 (7th Cir. 2016)). "Evidence must be considered as a whole, rather than asking whether a particular piece of evidence proves the case by itself." Ortiz, 834 F.3d at 765.

In her opposition brief, the plaintiff invokes the McDonnell Douglas framework but does not present evidence of similarly situated employees outside her protected class who were treated more favorably than she was. That means the court must analyze the plaintiff's claim using Ortiz's "totality of the evidence" approach rather than the McDonnell Douglas burden-shifting framework.

The plaintiff argues that the same evidence that supported her disability discrimination claim supports her race and color discrimination claim. But although the court has determined that a reasonable jury could find that the defendant harbored discriminatory animus against the plaintiff because of her *disability*, the court cannot reach the same conclusion about the plaintiff's *race* or *color*. None of Drown or Hansen's communications mention the plaintiff's

race or color, only her disability and associated absences. The record provides no evidentiary basis for an inference that the defendant sought to terminate the plaintiff because of her race or color.

The only piece of evidence related to the plaintiff's race and color is Drown's allegedly racist comments. In May 2021, the plaintiff complained to Hansen that Drown treated her differently because of her race (African American) and color (Black) and that he had made racially derogatory comments in the workplace, including stating that "it's like a little China town" regarding a coworker of Asian descent and stating that "If I were Mexican, I would own a taco truck." But the plaintiff was not terminated until January 2022—almost eight months later. The large window of time between Drown's alleged remarks and the decision to terminate the plaintiff is not sufficient to support a finding of race or color discrimination, especially when the alleged remarks did not relate to the plaintiff's own race or color. See Merillat v. Metal Spinners, Inc., 470 F.3d 685, 694 (7th Cir. 2006) ("isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus.").

Even if the comments did raise an inference of race or color discrimination, "statements by a nondecisionmaker do not satisfy a plaintiff's burden of proof in an employment discrimination case." Paluck v. Gooding Rubber Co., 221 F.3d 1003, 1010 (7th Cir. 2000) (quoting Eiland v. Trinity Hosp., 150 F.3d 747, 751 (7th Cir. 1998); Larimer v. Dayton Hudson Corp., 137 F.3d 497, 500 n.4 (7th Cir. 1998)). The plaintiff has not shown that Drown

was the decisionmaker responsible for her termination. The evidence demonstrates that Hansen was responsible for making the termination recommendation and that Snyder approved that recommendation. There is no evidence that Hansen expressed discriminatory animus against the plaintiff because of her race or color. The court will grant summary judgment for the defendant on the plaintiff's race discrimination claim.

In Count II of the complaint, the plaintiff also raises a Title VII retaliation claim. Title VII prohibits an employer from retaliating against an employee "because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." Igasaki, 988 F.3d at 959 (quoting 42 U.S.C. §2000e-3(a)). To defeat summary judgment, the plaintiff must present evidence that "(1) [s]he engaged in an activity protected by the statute; (2) [s]he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." Lewis v. Wilkie, 909 F.3d 858, 866 (7th Cir. 2018).

The parties do not dispute that the plaintiff engaged in protected activity by reporting Drown's alleged racist statements to Hansen, nor do they dispute that the plaintiff suffered an adverse action when the defendant terminated her. The plaintiff's claim hinges on whether there is a causal link between the protected activity and the discharge. The plaintiff needed to offer evidence that a retaliatory motive was a "but-for cause of the challenged employment action." Gracia v. SigmaTron Int'l, Inc., 842 F.3d 1010, 1019 (7th Cir. 2016) (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013)). "This requires

proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Nassar, 570 U.S. at 360. "'[R]etaliatory motive may be established through circumstantial evidence such as suspicious timing, ambiguous statements, evidence that the stated reason for the employment decision is pretextual and' other evidence from which an inference of discriminatory intent might be drawn." Gracia, 842 F.3d at 1019.

Here, the record evidence does not support an inference that the defendant terminated the plaintiff in retaliation for her complaint about Drown. As discussed above, a reasonable jury could find that the defendant terminated the plaintiff because of her disability and associated absences. That necessarily means that the plaintiff's complaint about Drown cannot be the but-for cause of her termination. And the eight-month period between the plaintiff's complaint about Drown's comments and her termination erodes any inference of retaliatory intent. The court will grant summary judgment for the defendant on the plaintiff's Title VII retaliation claim and will grant summary judgment for the defendant on Count II of the complaint.

3.    *FMLA Interference*

Count III of the complaint raises an FMLA interference claim, but the plaintiff argues in her opposition brief that she also has established an FMLA retaliation claim. Although a district court has discretion to allow a plaintiff to amend her pleadings on summary judgment, it would "rarely be appropriate to do so," especially where, as here, the attempted amendment amounts to

29

bringing an entirely new claim rather than raising a new legal theory related to an existing claim. Schmees v. HC1.COM, Inc., 77 F.4th 483, 489–90 (7th Cir. 2023). An FMLA interference claim and an FMLA retaliation claim have different proof requirements. A retaliation theory "requires proof of discriminatory or retaliatory intent," Kauffman v. Fed. Exp. Corp., 426 F.3d 880, 884 (7th Cir. 2005), while an interference theory requires only proof that the defendant "interfered with, restrained, or denied" the plaintiff's FMLA benefits, Ziccarelli v. Dart, 35 F.4th 1079, 1089 (7th Cir. 2022). The defendant has moved for summary judgment on the claim the plaintiff pled—the FMLA interference claim. It would be prejudicial to the defendant to allow the plaintiff to raise a new claim, requiring a new element of proof, at this late stage in the proceedings. The court will consider only the FMLA interference claim as pled in Count III of the complaint.

An FMLA interference claim requires the plaintiff to show that (1) she was an employee covered by the FMLA; (2) the defendant was an employer covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) the defendant interfered with, restrained, or denied FMLA benefits to which she was entitled. Ziccarelli v. Dart, 35 F.4th 1079, 1089 (7th Cir. 2022). The parties dispute only whether the defendant interfered with or denied the plaintiff FMLA benefits.

The defendant contends that to state an FMLA interference claim, the plaintiff *must* show that the defendant denied her benefits to which she was entitled. The defendant is relying on outdated law. In Ziccarelli, the Seventh

Circuit held that "denial of FMLA benefits is not required to demonstrate an FMLA interference violation" and that "[i]nterference or restraint alone is enough to establish a violation." 35 F.4th at 1089. The plaintiff need not show that the defendant denied her FMLA benefits; she can prove her claim by demonstrating interference or restraint. The court finds that she has done so.

The Seventh Circuit previously has addressed the interplay between employer attendance policies and FMLA leave. <u>Kauffman</u>, 426 F.3d at 884. The plaintiff in <u>Kauffman</u> missed three days of work due to bronchitis. 426 F.3d at 882. The employer's policy was to terminate an employee who incurred three disciplinary "strikes." <u>Id.</u> If those three absences were unexcused, the plaintiff would incur a third strike and be eligible for termination. <u>Id.</u> Upon his return to work, the plaintiff provided his supervisor with a doctor's note. <u>Id.</u> The supervisor recommended that the plaintiff apply for FMLA leave and gave him fifteen days in which to do so. <u>Id.</u> On the morning of the fifteenth day, the plaintiff's supervisor asked him for the completed paperwork. <u>Id.</u> The plaintiff responded that he had turned it in earlier but offered to go home and get another copy or have his doctor fax a new copy to the supervisor. <u>Id.</u> The supervisor refused to wait and fired the plaintiff on the spot. <u>Id.</u> The district court granted summary judgment for the defendant on the plaintiff's FMLA interference claim. <u>Id.</u>

The Seventh Circuit stated that because "it is undisputed that [the defendant] fired [the plaintiff] because he was absent, the outcome turns on the narrow question of [the plaintiff's] entitlement to FMLA leave," specifically,

"whether he turned his paperwork in on time and whether that paperwork was sufficient to certify a serious health condition qualifying for FMLA leave." Id. at 885. After determining that the paperwork was timely and contained enough information to establish that the plaintiff qualified for FMLA leave, the Seventh Circuit reversed and remanded the case to the district court. Id. at 887.

The key facts of this case are similar to those in Kauffman. Here, the plaintiff also was fired due to "unexcused" absences—absences she incurred due to an FMLA-covered condition. As in Kauffman, the defendant knew of the plaintiff's illness and knew that she was seeking FMLA leave. The parties do not dispute whether the plaintiff had an FMLA-covered condition or whether she was entitled to FMLA leave. There is no dispute that the plaintiff submitted her paperwork on time; Sedgwick approved the plaintiff's FMLA request on January 18, 2022, one day before the deadline for the plaintiff to submit her paperwork. The undisputed facts show that the plaintiff was eligible for and entitled to FMLA leave on the twelve days the defendant marked her a "no call no show." The defendant simply fired the plaintiff before her FMLA leave could be approved.

The defendant cannot use its attendance policy as an excuse to violate the law. An employee is not required to give advance notice of her need for leave if the need for leave is unforeseeable, as with a sudden illness. See 29 C.F.R. §§825.303(a). The FMLA regulations contemplate that it could take at least twenty days for an employee's FMLA leave request to be approved. See 29 C.F.R. §§825.305(b) (employee has at least fifteen calendar days to provide

medical certification supporting her need for leave); §825.300(d)(1) (employer has at least five business days after receiving medical certification to notify employee if leave is approved). So, an employee may permissibly be in "limbo" awaiting her FMLA approval for twenty days or more after her serious medical condition has commenced. Further, employers are not allowed to count FMLA-covered leave as an absence under "no fault" attendance policies like the defendant's. See 29 C.F.R. §825.220(c). That means that once the plaintiff's FMLA leave was approved, the defendant could not have counted those absences as attendance policy violations. To accept the defendant's position—that an employee can be fired for prohibited reasons solely because her FMLA request had not yet been approved—would fly in the face of the rationale behind the FMLA. It would grant employers permission to race the clock to fire FMLA-covered employees with FMLA-covered serious medical conditions during the pendency of their FMLA application. Firing an employee for leave-related absences before her leave can be approved constitutes interfering with, restraining or denying her rights under the FMLA.

That is not to say that while an FMLA application is pending, an employee cannot be terminated for reasons unrelated to her need for medical leave. And if an employee's FMLA leave request subsequently is denied, it might be permissible for the employer to count any absences during the pendency of the FMLA request as unexcused under an attendance policy. But here, where the defendant (vigorously) contends that it terminated the plaintiff *solely* due to her absences, those absences were *solely* due to an FMLA-covered condition

and the plaintiff had properly applied for (and later was approved for) FMLA leave, the fact that the plaintiff's FMLA leave request had not yet been approved at the time of the absences does not give the defendant carte blanche to fire her for those absences.

The court will deny summary judgment for the defendant on Count III of the complaint.

## IV.     Conclusion

The court **GRANTS IN PART** and **DENIES IN PART** the defendant's motion for summary judgment. Dkt. No. 29.

The court **GRANTS** summary judgment for the defendant on Count II of the complaint and **ORDERS** that Count II is **DISMISSED WITH PREJUDICE**. The court **DENIES** summary judgment for the defendant on Counts I and III of the complaint.

The court will issue a separate order setting a scheduling conference to discuss with the parties next steps in the case.

Dated in Milwaukee, Wisconsin this 30th day of September, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**